382 F.2d 807
 Robert F. WASSON, Jr., Appellant,
v.
Alexander B. TROWBRIDGE, Acting Secretary of Commerce of the United States, United States Merchant Marine Academy, and Gordon McLintock, Superintendent of the United States Merchant Marine Academy, Appellees.
 No. 522.
 Docket 31426.
 United States Court of Appeals Second Circuit.
 Argued June 8, 1967.
 Decided September 13, 1967.
 
 Burt Neuborne, New York Civil Liberties Union, New York City (Donald D. Shack, New York City, Sidney Romash, Brooklyn, N. Y., on the brief), for appellant.
 Michael Rosen, Asst. U. S. Atty. (Joseph P. Hoey, U. S. Atty., for Eastern Dist. of New York, Brooklyn, N. Y., David P. Steinmann, Asst. U. S. Atty., on the brief), for appellees.
 Before MOORE, FRIENDLY and ANDERSON, Circuit Judges.
 MOORE, Circuit Judge.
 Robert F. Wasson, Jr., appeals from an order denying without a hearing his motion to restrain Acting Secretary of Commerce Trowbridge from permitting his expulsion from the Merchant Marine Academy in alleged violation of his constitutional rights and dismissing his complaint. Judge Bruchhausen held that as the allegations of the complaint did not on their face amount to a deprivation of due process, this suit was barred by the doctrine of sovereign immunity. However, whether any question of due process is involved is dependent upon such facts relating thereto as may be adduced and, therefore, appellant's constitutional claims cannot be dismissed without an evidentiary hearing. Hence, we remand the case for a hearing on the constitutional sufficiency of the Academy's proceedings against Wasson.
 The Merchant Marine Academy (the Academy) located at Kings Point, New York, is the instrumentality of the federal government charged with the responsibility of training the officers of the United States Merchant Marine. Although the primary responsibility of the merchant marine is the transport of water-borne commerce, in times of need it acts as an auxiliary to the United States Navy and on graduation, a Cadet may receive a Reserve Commission in the Navy. Indeed, because of the vital national interest served by the merchant marine and the hazards which are commonly encountered, it accurately may be said that the responsibilities of merchant marine personnel are comparable to those of the Navy and Coast Guard. Chief Justice Maltbie once observed
 
 
 1
 that the successful prosecution of (the Second World War) would hardly have been possible without the transportation facilities afforded by merchant vessels operating under the war shipping administration and that the persons who served in those vessels were subject to most serious danger of injury or loss of life from risks directly inherent in armed conflict at sea and on the shore [Walsh v. Jenks, 135 Conn. 210, 62 A.2d 773 (1948)].
 
 
 2
 The Regulations of the Academy themselves recite the basis for the prerequisite that Cadets conduct their affairs with a military bearing:
 
 
 3
 The standards of discipline required by Academy Regulations must necessarily be high, since offenses which might be condoned in other walks of life cannot be tolerated aboard ships of the Merchant Marine or Navy where sins of omission or commission might cost human lives or millions of dollars worth of property. The Merchant Marine is run entirely by the discipline of the officers, by their standards, so their ships are run, and good discipline among all officers is paramount.[1]
 
 
 4
 The appellant Wasson is a third-year student at the Academy. On March 30, 1967, he engaged in, and perhaps led, "an unauthorized mass movement" of his fellow students, the object of which was to throw a Cadet Regimental Officer into Long Island Sound. As such conduct indisputably constituted a violation of Academy regulations, the disciplinary measures, about which Wasson now complains, were instituted.
 
 
 5
 Breaches of Academy discipline are comprehensively governed by the Regulations of the Academy and fall into three general classifications (Art. 200.04). Class I offenses are of a serious nature and may be punished by immediate dismissal. Class II offenses are of intermediate seriousness and may be punished by the assignment of not more than 100 demerits. Class III offenses are the least serious and the punishment cannot exceed 50 demerits. If a Cadet accumulates over a fixed number of demerits in a given year, which for a third-year student such as Wasson is 200, he becomes liable to dismissal (Art. 200.13). Reports of misconduct may originate from an officer, an instructor or a Cadet officer (Art. 200.05) and are presented to the Battalion Officer. He either investigates the report or assigns another to investigate and then forwards the report with his recommendations to the Regimental Officer (Art. 200.07). Thereafter the disciplinary procedure varies radically depending on how the offense is classified by the Regimental Officer. If the offense falls within Class III, the Regimental Officer himself determines the punishment (Art. 200.07(c) (2)) and there is no appeal (Art. 200.11). At the other extreme, if a Class I offense is involved, the Cadet is entitled to numerous procedural safeguards. He receives a written statement of the charges against him (Art. 200.09(a)) to which he may reply. He is entitled to a hearing before a Board of officers not drawn from the same Regiment as the Cadet (Art. 200.09(a)). At the hearing he may be represented by counsel of his choosing although only officers on the Academy staff are eligible (Art. 200.10 (a)). Significantly, however, the Regulations charge counsel with serving as an advisor to the Cadet, not with advocacy, and it is his duty to assist in finding the truth, not in obscuring it (Art. 200.10 (b)). The decision of the hearing Board in form is a recommendation to the Superintendent of the Academy. If the recommendation is for dismissal, the Superintendent in turn may forward such recommendation to the Maritime Administrator for final action. At each of these stages, the Cadet has an opportunity to appeal (Arts. 200.09(c) and 200.11(b)).
 
 
 6
 Wasson was charged with a Class II offense for his activities of March 30th. On April 10th he was served with a detailed specification of the charges against him and notified that a hearing would be held on April 13th. As permitted by the Regulations, Wasson filed his own statement prior to the hearing. He also made a demand for counsel which was denied as the Regulations did not provide for counsel at hearings on Class II offenses. Contrary to the procedure governing a Class I offense, the Regimental Board of Investigation which hears a Class II offense is drawn from the same Regiment as the Cadet (Art. 200.08(a)). However, Article 200.08 of the Regulations does provide that "the reporting or investigating officer shall not sit as a member of the Board." On April 12th, Wasson protested the composition of the panel on the ground that it violated this Article. The protest was rejected on the ground that none of the members of the panel had been involved with Wasson but the accompanying memorandum of the Regimental Officer is ambiguous on the question of whether any members of the panel had reported or investigated other Cadets involved in the March 30th incident. On April 13th, this panel conducted its investigation and awarded Wasson 75 demerits. Because he had previously accumulated 148 demerits, this award subjected Wasson to dismissal from the Academy. Pursuant to the Regulations (Art. 200.11(a)), Wasson appealed the decision to the Superintendent of the Academy who conferred with Wasson and rejected his appeal.
 
 
 7
 Because Wasson had now exceeded his maximum allowance of demerits and was subject to dismissal, the Superintendent convened the Senior Board of Aptitude, Conduct and Discipline Review which is drawn from the Academy staff and faculty and whose function under Article 200.13(f) was "to interview the Cadet and to review his entire discipline and conduct record at the Academy, and to determine whether or not the Cadet should be retained." Wasson again demanded counsel which was denied. He appeared before the Board and presented his case but the Board recommended dismissal. Wasson again appealed to the Superintendent who again rejected the appeal. Wasson's present posture is that the Superintendent has recommended his dismissal to the Maritime Administrator and it is not contested that final action by the Administrator is a mere formality.
 
 I. Sovereign Immunity
 
 8
 There is an undue wealth of controversy in the briefs before this Court on the issue of whether this suit is barred because it is in essence against the United States. The Academy appears to concede, however, that if an officer of the United States violated Wasson's constitutional rights in the dismissal procedure, the doctrine of sovereign immunity is no bar to this suit for injunctive relief against that dismissal. Indisputably the District Court had jurisdiction to determine whether the procedure applied to Wasson was constitutionally sufficient. Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1907); Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1951); Cafeteria & Restaurant Workers Union v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). The District Court dismissed this suit on the ground that the allegations of the complaint did not constitute a deprivation of due process of law and thus this suit was, in fact, barred.
 
 II. The Constitutional Standard
 
 9
 A number of recent decisions in the federal courts involving somewhat similar facts have held that when the government affects the private interests of individuals, it may not proceed arbitrarily but must observe due process of law. See, e. g., Cafeteria & Restaurant Workers Union v. McElroy, supra, Hannah v. Larche, 363 U.S. 420, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960); Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959). Nevertheless, the flexibility which is inherent in the concept of due process of law precludes the dogmatic application of specific rules developed in one context to entirely distinct forms of government action. "For, though `due process of law' generally implies and includes actor, reus, judex, regular allegations, opportunity to answer, and a trial according to some settled course of judicial proceedings, * * * yet, this is not universally true." Murray's Lessee v. Hoboken Land and Improvement Co., 59 U.S. (18 How.) 272, 280, 15 L.Ed. 372 (1855). And see Cafeteria & Restaurant Workers Union v. McElroy, supra; Dixon v. Alabama State Board of Education, 294 F.2d 150 (5 cir.), cert. denied, 368 U.S. 930, 82 S. Ct. 368, 7 L.Ed.2d 193 (1961). Thus to determine in any given case what procedures due process requires, the court must carefully determine and balance the nature of the private interest affected and of the government interest involved, taking account of history and the precise circumstances surrounding the case at hand.
 
 
 10
 While the government must always have a legitimate concern with the subject matter before it may validly affect private interests, in particularly vital and sensitive areas of government concern such as national security and military affairs, the private interest must yield to a greater degree to the governmental. By contrast in the Dixon case where no such paramount government interest appeared, the court required a state supported university to hold a full hearing preserving in substantial degree the essentials of an adversarial proceeding before it could expel a student. Although the private interest affected in this case may appear to be more substantial than in Dixon because the alternatives available to a student expelled from a state university are not available to Wasson, nevertheless the essential characteristics of fitness for duty of those who would assume positions of responsibility in the Merchant Marine cannot be overestimated (see "Conduct and Discipline" fn. 1), and the substantiality of the government interest here involved is entirely clear. Few decisions properly rest so exclusively within the discretion of the appropriate government officials than the selection, training, discipline and dismissal of the future officers of the military and Merchant Marine. Instilling and maintaining discipline and morale in these young men who will be required to bear weighty responsibility in the face of adversity — at times extreme — is a matter of substantial national importance scarcely within the competence of the judiciary. And it cannot be doubted that because of these factors historically the military has been permitted greater freedom to fashion its disciplinary procedures than the civilian authorities.
 
 
 11
 We conclude, therefore, that due process only requires for the dismissal of a Cadet from the Merchant Marine Academy that he be given a fair hearing at which he is apprised of the charges against him and permitted a defense. It would be most unwise, if not impossible, for this Court to spell out in detail the specific components of a fair hearing in the context of expulsion from the Academy without the benefit of findings by a District Court because Regulations which appear harsh in the abstract to Judges more attuned to adversary civilian trials may prove entirely reasonable within the confines of Academy life. For the guidance of the parties, however, the rudiments of a fair hearing in broad outline are plain. The Cadet must be apprised of the specific charges against him. He must be given an adequate opportunity to present his defense both from the point of view of time and the use of witnesses and other evidence. We do not suggest, however, that the Cadet must be given this opportunity both when demerits are awarded and when dismissal is considered. The hearing may be procedurally informal and need not be adversarial.
 
 
 12
 Wasson most strenuously has urged that he was entitled to representation by counsel at one or both of the challenged hearings. We disagree. The requirement of counsel as an ingredient of fairness is a function of all of the other aspects of the hearing. Where the proceeding is non-criminal in nature, where the hearing is investigative and not adversarial and the government does not proceed through counsel, where the individual concerned is mature and educated, where his knowledge of the events of March 30th should enable him to develop the facts adequately through available sources, and where the other aspects of the hearing taken as a whole are fair, due process does not require representation by counsel. It is significant that in the Dixon case where the balancing of government and private interests favored the individual far more than here, the court did not suggest that a student must be represented by counsel in an expulsion proceeding.
 
 
 13
 Against this background, we must now ascertain whether the allegations of the complaint can be read consistently with due process.
 
 III. The Complaint
 
 14
 In substance Wasson charges that members of the panel which awarded the demerits had participated in the investigation against him. This combination of the functions of policeman and judge, he argues, resulted in a biased panel and, thus, the hearing was not fair. It is too clear to require argument or citation that a fair hearing presupposes an impartial trier of fact and that prior official involvement in a case renders impartiality most difficult to maintain. In fact, the Regulations of the Academy prescribe this separation of functions. Of course the closeness of Academy life and the manpower limitations of a Regiment may at times make it unduly burdensome or impossible to secure a panel wholly lacking previous contact with the events in issue, yet the hearing must proceed. We think, however, that Wasson was entitled to show that members of the panel had had such prior contact with his case that they could be presumed to have been biased.
 
 
 15
 Secondly, Wasson alleged that he was denied a continuance in order to obtain favorable witnesses and that he was given only three days in which to prepare for the hearing and that the effect of this ruling deprived him of the opportunity to defend himself. There are many reasons why the Academy could properly deny a request for a continuance but Wasson is entitled to attempt to prove that none of these reasons applied and that he was thereby seriously prejudiced.
 
 
 16
 Finally, he alleges that he was never fully told of the evidence against him. Here again, this allegation, even if true, does not necessarily constitute a violation of due process. Particularly on the question of Wasson's fitness to remain a Cadet, he is not entitled to see the confidential opinions of members of the faculty. Nevertheless, the charge is a serious one, for a Cadet is utterly unable to defend against unknown evidence, and should not be dismissed without the holding of an evidentiary hearing into the nature of the concealed evidence, if any, and the reason for withholding it.
 
 
 17
 We therefore remand this case to the District Court for a hearing on the question of whether in the light of this opinion the procedures used against Wasson comported with due process of law.
 
 
 18
 Reversed and remanded.
 
 
 
 Notes:
 
 
 [1]
 See also Regulations of the Academy, Section Two, "Conduct and Discipline";
 "PREAMBLE
 "Honor, integrity, loyalty to superiors, and reverence for the traditions of the Merchant Marine of the United States are fundamental characteristics and attributes of a successful Merchant Marine Officer. Any Cadet unable to conduct himself in a manner indicating the highest standard of honesty, integrity, and manliness, is not worthy to become a licensed Merchant Marine Officer or to enjoy the privileges and receive the education and training provided by the Government, and shall be subject to separation from the Academy.
 "Article 200.00. A high standard of discipline must be maintained at the Academy. The regulations, instructions, rules and orders, which control the discipline of the Academy and its corps of Cadets, are prescribed by the Superintendent. There must be no hesitancy or failure on the part of a Cadet to recognize the authority delegated by the Superintendent to subordinate officers. It is considered serious misconduct for any Cadet, alone or in concert with others, to adopt any measure — oral or written — for the purpose of violating or evading any Academy rule or regulation. No Cadet, alone or in concert with others, shall commit any act contrary to the rules of good order or discipline, or endeavor to induce others to commit such an act.
 "Article 200.01. Cadets must realize that courtesy and respect will not be confined to obedience on duty, but will extend to all occasions. They should be aware of the fact that rules of merchant shipboard and naval etiquette are founded on customs and tradition, and it should be their first duty and pride to learn and conform to these vital factors so important to the maintenance of discipline. Appendix A of this book contains important information on customs of the service, with which all Cadets must become acquainted during their fourth class year at the Academy."