Albert E. ANDREWS, III, Appellant,

v.

Lt. General William KNOWLTON, etc., et al., Appellees.

William H. WHITE et al., Appellants,

v.

Lt. General William KNOWLTON, etc., et al., Appellees.

Nos. 939, 940, 1187, Dockets 73–1866, 74–1074 and 74–1782.

United States Court of Appeals, Second Circuit.

Argued Aug. 12, 1974.

Decided Jan. 16, 1975.

Paul J. Curran, U. S. Atty., New York City (William Roche Bronner, Gerald A. Rosenberg, Asst. U. S. Attys., of counsel), for appellees.

Wood & Floge, Langhorne, Pa. (Joseph M. Grines, Langhorne, Pa., of counsel), for appellant White, and others.

Thal & Youtt, New York City (Harry E. Youtt, New York City, of counsel), for appellant Andrews.

Before OAKES, Circuit Judge, and FRANKEL and KELLEHER, District Judges.*

KELLEHER, District Judge:

These are two consolidated appeals from separate orders of the United States District Court for the Southern District of New York dismissing each of the complaints after rejecting claimed denials of due process. White v. Knowlton, 361 F.Supp. 445 (S.D.N.Y.1973); Andrews v. Knowlton, 367 F.Supp. 1263 (S.D.N.Y.1973). We affirm.

In two separate actions arising out of different circumstances, appellants, who but for this appeal have been or will be separated from the United States Military Academy at West Point, New York, sought in the District Court for the Southern District of New York declaratory and injunctive relief against appellees, the Superintendent and Commandant of the Academy, and the Secretary of the Army, staying and setting aside their separation from the Academy for violation of the Cadet Honor Code.

* Of the Southern District of New York and Central District of California, respectively, sitting by designation.

Each appellant complains that the Cadet Honor Committee proceedings and subsequent hearings before the Board of Officers which resulted in separation from the Academy were so lacking in procedural safeguards as to constitute a deprivation of their constitutional rights. Each appellant here was first adjudged by the Cadet Honor Committee to be "guilty" of an Honor Code violation and was later found in proceedings before a Board of Officers to have violated the Honor Code. Each appellant was then separated from the Academy.

## I

The facts in the Andrews case are simple and undisputed. While on a weekend pass, Cadet Andrews was observed on West Point grounds out of uniform in an unauthorized vehicle in which alcohol was found. The Military Police apprehended him and turned him over to the Tactical Officer on duty. In accordance with standard procedures, the cadet was required to submit a written explanation of the circumstances surrounding his reported rules infraction. Andrews' first report was incomplete, but ultimately he gave a statement which alleged, *inter alia*, that he had been present on Academy grounds with the vehicle for fifteen to twenty minutes. This statement contradicted a previously-submitted report of the military police which placed the vehicle on campus and under observation for over two hours. The case initially involved only the possibility of Andrews receiving demerits for his conduct, but because of the discrepancy between the times in the two reports, the matter was referred to the Cadet Honor Committee. In substance his case as brought before that committee involved an allegation of lying.

The facts in the *White* case are equally simple and uncontroverted. On April 5 and 6, 1973, the Department of Physics at the Academy administered four examinations. The same true-false and multiple choice questions were asked in two separate sections at different times. Because the Department was concerned about cheating, the order in which the questions were asked in the later examinations was scrambled. Each of the appellants took his examination at one of the later hours, and each paper showed what was felt to be an unreasonably high number of answers which, although inaccurate in the examination taken, correlated to approved solutions in the earlier examination. Cadet White and his co-appellants' cases were referred to the Cadet Honor Committee on the ground that they and others had obtained and utilized lists of approved answers. In substance the case against White and his co-appellants involved cheating.

Article 16 of the Regulations for the United States Military Academy, promulgated by the Secretary of the Army, governs the separation of cadets. Section 16.04 deals specifically with separations for Honor Code violations and provides:

"a. A cadet who violates the Cadet Honor Code will be separated from the Academy. A cadet who is alleged to have violated the Honor Code may, at the discretion of the Superintendent, be allowed to resign, be tried by court-martial, or be brought before a board of senior officers convened by the Superintendent to investigate the matter, and to make findings. In the event of trial, the action taken will be in accordance with the provisions of the Uniform Code of Military Justice, and applicable regulations.

"b. If the cadet appears before a board of officers, the board will make findings with respect to all alleged violations of the Cadet Honor Code by the cadet concerned, and will submit a report of its proceedings and findings to the Superintendent. A copy of the report will be furnished to the respondent, who may submit a written statement to the Superintendent.

"c. The Superintendent may seek the advice of any member of his staff or the Academic Board. He will review the report of proceedings; give full consideration to any statement submitted by the respondent; and ap-

prove or disapprove, in whole or in part, the findings of the board of officers. If he approves a finding of a violation of the Cadet Honor Code, he will submit his recommendation and all pertinent documents to Headquarters, Department of the Army, for final action. In such cases, and in cases of cadets who are allowed to resign, the Superintendent will also recommend either discharge from the service or transfer to an appropriate status in a Regular or Reserve component. If discharge is recommended, the type discharge will be specified."

While nothing in Section 16.04 above indicates that the Cadet Honor Committee plays any part in the process of separation for Honor Code violations, it appears that the Academy has developed the practice of referring all alleged violations to the Honor Committee. This procedure, as now outlined in a memo from the Commandant entitled "USCC Processing of Cadet Honor Cases" and distributed throughout the Academy command on November 29, 1972, specifically requires that apparent violations discovered by officers be first referred to the Cadet Honor Committee.

The Cadet Honor Committee is a student organization of the United States Corps of Cadets made up of 44 elected members. According to the Corps of Cadets' publication, *The Cadet Honor Code and Systems*, the Honor Committee is directly charged with the supervision and administration of the Honor Code and the Honor System, and "acting for the Corps, investigates and determines whether or not the alleged offender has actually transgressed the Honor Code."

The Cadet Honor Code in force at the United States Military Academy consists of a single maxim: "A cadet does not lie, cheat or steal or tolerate those who do."

When a case is referred to the Cadet Honor Committee, there is first a preliminary subcommittee investigation, and then twelve members are designated by the chairman to sit and hear the evidence. After all the witnesses have testified and the evidence has been presented, a secret vote is held to determine guilt or innocence. The vote must be unanimous, and if there is one "not guilty" vote, the proceedings end and the case is closed. During proceedings before the Honor Committee, an accused cadet is allowed to testify and to present witnesses on his own behalf. It should be noted that a cadet is not guaranteed any minimal time in which to prepare a case brought before the Honor Committee. In the cases now before us, the time between oral notice of a proceeding by the Honor Committee and the actual hearing ranged from three hours to several days. A cadet is not given formal written notice of the charges against him, and he has no right to know the identity of or cross-examine the witnesses against him. And, while it appears that there are provisions for "open hearings" before the Cadet Honor Committee none was allowed in any of the cases now before us.

The cadet publication (printed by the Academy) referred to above further explains that "[i]f there be a finding of guilty, the Commandant reviews the case with his advisors and with the Chairman of the Honor Committee. He then interviews the accused after advising him of his rights, reminds him of the findings and recommendations of the Committee, and, in effect, extends him the option of resigning or having his case considered by a Board of Officers. The accused is urged to confer with his parents and, if he desires, to seek legal advice before he makes his decision."

In all of the cases encompassed by the present appeals, the Cadet Honor Committee found a violation of the Honor Code which was adopted by the Commandant, whereupon appellants were administratively segregated from the Corps and placed in "Boarders Ward." The purpose of Boarders Ward is to quarter those cadets who are undergoing separation actions. Permitted to attend classes, the cadet is sequestered in Boarders Ward until final disposition of his case.

In the cases now before us after being given the option to resign or have a Board of Officers' hearing, each appellant chose to appear before a Board of Officers. Each Board of Officers was composed of five officers from the Academy staff summoned to hear one case. The proceedings were conducted pursuant to Army Regulation 15–6, Procedures for Investigating Officers Conducting Investigations, which provides in part that after a full hearing, the Board will, based on a standard of "substantial evidence," decide a case by a majority vote. The Boards in the White case found each appellant guilty of violating the Honor Code by cheating. The Board in the Andrews case found Andrews guilty of violating the Honor Code by lying.

It now appears that after each appellant was adjudged guilty by a Board of Officers, each exhausted his administrative remedies, the proceedings having been reviewed successively by the West Point Staff Judge Advocate, the Superintendent of the Academy, and the Secretary of the Army, acting through one of his staff members.

## II

Three common issues are raised by each appellant: (1) whether the proceedings before the Cadet Honor Committee comported with the procedural safeguards required by the Due Process Clause of the Fifth Amendment; (2) whether the procedures and the standard of proof utilized in the Board of Officers' hearings under Army Regulation 15–6 comported with the procedural due process guarantees of the Fifth Amendment; and (3) whether the sole penalty of expulsion of each appellant constitutes a violation of constitutional rights.

Andrews raises two additional issues unique to his case: (1) whether the requirement that he submit a written statement which was later used against him in the administrative hearings violated his Fifth Amendment. privilege against compulsory self-incrimination; and (2) whether he was erroneously fore-

closed by the dismissal of the complaint before discovery from factually establishing the impact of the finding of guilty by the Cadet Honor Committee upon the members of the Board of Officers.

In summary, the basic question before this Court is whether the procedures followed by the United States Military Academy at West Point, New York, in the separation of appellants for Honor Code violations were constitutionally sufficient.

## III

██ The power of the District Court to review procedures used at our service academies in the separation or dismissal of cadets and midshipmen is clear. Wasson v. Trowbridge, 382 F.2d 807 (2d Cir. 1967); Hagopian v. Knowlton, 470 F.2d 201 (2d Cir. 1972). Since *Wasson, supra,* it has been understood that the service academies are subject to the Fifth Amendment and that cadets and midshipmen must be accorded due process before separation.

This Court noted in Hagopian v. Knowlton, *supra,* "[i]n approaching the question of what process is due before governmental action adversely affecting private interests may properly be taken, it must be recognized that due process is not a rigid formula or simple rule of thumb to be applied undeviatingly to any given set of facts. On the contrary, it is a flexible concept which depends upon the balancing of various factors, including the nature of the private right or interest that is threatened, the extent to which the proceeding is adversarial in character, the severity and consequences of any action that might be taken, the burden that would be imposed by requiring use of all or part of the full panoply of trial-type procedures, and the existence of other overriding interests, such as the necessity for prompt action in the conduct of crucial military operations. The full context must therefore be considered in each case." 470 F.2d at 207.

In *Hagopian* this Court held that a full hearing was required before a cadet

could be separated from the United States Military Academy for excessive demerits. The Court noted that at such a hearing a "cadet must be allowed to appear and present evidence, including witnesses, on his behalf." 470 F.2d at 211. In reaching this conclusion, the Court relied heavily on Wasson v. Trowbridge, *supra*, a similar case decided five years earlier.

In *Wasson* a third year student at the Merchant Marine Academy at Kings Point, New York, was dismissed after a hearing because of his accumulation of demerits in excess of the maximum allowance. Cadet Wasson challenged the denial of counsel at both the hearing awarding his demerits and the hearing recommending his dismissal from the Academy. He further charged in his complaint filed in the District Court that members of the panel awarding the demerits had participated in the investigation of facts leading up to the demerit hearing, that he had been denied a full opportunity to obtain and present favorable witnesses, and that notice of the hearing failed to give him adequate time to prepare a defense and failed to fully inform him of the evidence against him. The District Court's dismissal of the complaint based on the grounds that the charges contained therein did not amount to a denial of due process was reversed, and the case was remanded for a hearing to determine whether the procedures used in the separation of *Wasson* comported with due process of law. Taking note of the special context in which the challenged procedures operated, this Court set forth in *Wasson* in broad outline the required minimum standards of due process:

> "While the government must always have a legitimate concern with the subject matter before it may validly affect private interests, in particularly vital and sensitive areas of government concern such as national security and military affairs, the private interest must yield to a greater degree to the governmental. . . . Few decisions properly rest so exclusively within the discretion of the appropri-

ate government officials than the selection, training, discipline and dismissal of the future officers of the military and Merchant Marine. Instilling and maintaining discipline and morale in these young men who will be required to bear weighty responsibility in the face of adversity—at times extreme—is a matter of substantial national importance scarcely within the competence of the judiciary. And it cannot be doubted that because of these factors historically the military has been permitted greater freedom to fashion its disciplinary procedures than the civilian authorities.

> "We conclude, therefore, that due process only requires for this dismissal of a Cadet from the Merchant Marine Academy that he be given a fair hearing at which he is apprised of the charges against him and permitted a defense. . . . For the guidance of the parties . . . the rudiments of a fair hearing in broad outline are plain. The Cadet must be apprised of the specific charges against him. He must be given an adequate opportunity to present his defense both from the point of view of time and the use of witnesses and other evidence. We do not suggest, however, that the Cadet must be given this opportunity both when demerits are awarded and when dismissal is considered. The hearing may be procedurally informal and need not be adversarial.

> ". . . The requirement of counsel as an ingredient of fairness is a function of all of the other aspects of the hearing. Where the proceeding is non-criminal in nature, where the hearing is investigative and not adversarial and the government does not proceed through counsel, where the individual concerned is mature and educated, where his knowledge of the events . . . should enable him to develop the facts adequately through available sources, and where the other aspects of the hearing taken as a whole are fair, due process does not require representation by counsel." 382 F.2d at 812.

The holdings of *Wasson* and *Hagopian*, while they dealt with dismissal proceedings because of excessive demerits, are equally controlling here where appellants were separated from the Academy for violation of the Honor Code. From their teaching, it is clear that before a cadet can properly be dismissed or separated from his service academy, he must have a hearing, be apprised of the specific charges against him, and be given an adequate opportunity to present his defense both from the point of view of time and the use of witnesses and other evidence. A military proceeding conducted within these bounds of procedural due process would be proper and immune from constitutional infirmity. We and other tribunals have expanded at an accelerated pace the scope of judicial access for review of military determinations.[1] Nevertheless, we recognize the constitutional permissibility of the military to set and enforce uncommonly high standards of conduct and ethics.

## IV

In the cases now before us, each appellant, after the adverse determination by the Cadet Honor Committee, was given a hearing before a Board of Officers where he had counsel, was allowed to call and cross-examine witnesses, and had the right to offer and object to the introduction of any evidence. Moreover, each appellant was given formal written notice of the charges against him and ample time with the aid of counsel to prepare his defense.

While appellants concede that the procedures followed by the Boards of Officers provide for the protection of their fundamental rights, they challenge the use of the evidentiary standard in Army Regulation 15–6, which provides for decisions of Boards of Officers by majority verdict based upon substantial evidence. Appellants contend that establishment of guilt beyond a reasonable doubt and by unanimous verdict is mandated by "the custom and written interpretation of the Honor Code." The custom and written interpretation herein alleged to supersede Army Regulation 15–6 are those of the Honor Committee cadets themselves.

Two responses are in order. First, this custom, by its own terms, relates only to the proceedings before the Cadet Honor Committee, and in no way binds the Boards of Officers. Second, insofar as a cadet "regulation" and one by the Secretary of the Army conflict, it is imperative to military discipline that the latter take complete precedence over the former. Appellants' contrary assertion is unsupported either by the published regulations or by a sensible construction of the scope of the powers of the Cadet Committee. Moreover, since the "custom and written interpretation" of the Honor Code have neither been published in the Federal Register nor distributed under Academy auspices, it does not create legally binding rights or obligations. Cf., Federal Register Act, 44 U.S.C. § 1505, Siomkin v. Fairchild Camera & Instrument Corp., 174 F.2d 289 (2d Cir. 1949) (L. Hand, J.); accordingly, we find that the proceedings before the Boards of Officers in no way impaired any constitutional right.

Appellants further contend that the hearings before the Cadet Honor Committee were "critical stages" in the separation process and, therefore, demand the same procedural safeguards as were present in each Board of Officers' hearing. They argue that as a result of the "guilty verdicts" by the Honor Committee, the separation process was so tainted and infected by the Honor Committees' determinations as to foreclose any question of guilt; each cadet suffered a great loss of liberty and privilege; each cadet's reputation within the corps was irreparably injured; and each cadet was pressured into resigning.

1. See, for example, an exhaustive compilation, treatment, and critique of the law as it applies to the service academies, Rose, A Prayer for Relief, The Constitutional Infirmities of the Military Academies' Conduct, Honor and Ethics Systems (1973), New York University School of Law.

Appellees reply that no particular procedure is required by the Due Process Clause in Cadet Honor Committee hearings, for the requirements of *Wasson* and *Hagopian* have been satisfied because the hearings before the Boards of Officers were *de novo* and each appellant was there afforded his due process rights *before* he was separated; and the activities of the Cadet Honor Committee should not be considered governmental activity subject to due process limitations because the committee is nothing more than a student-created, student-run, preliminary investigating body whose determinations of an Honor Code violation may trigger but do not otherwise affect the administrative proceedings.

Initially, we address the question of whether the activities of the Cadet Honor Committee can for the purposes of the Due Process Clause be considered governmental activity. The relationship between the Cadet Honor Committee and the separation process at the Academy has been sufficiently formalized, and is sufficiently interdependent, so as to bring that committee's activities within the definition of governmental activity for the purposes of our review. While the Academy has long had the informal practice of referring all alleged violations to the Cadet Honor Committee, the relationship between that committee and the separation process has to a degree been formalized. The November 29, 1972, memorandum from the Commandant, "USCC Processing of Cadet Honor Cases," provides in part that apparent violations of the Cadet Honor Code will be referred by the Deputy Commandant to the Chairman of the Cadet Honor Committee; if a cadet is found by the Honor Committee to have committed a violation and then elects to have proceedings before a Board of Officers, the chairman of the Honor Committee will be notified, and if the Board's findings do not support the allegations of the Cadet Honor Committee, its chairman will

be advised by the Deputy Commandant to reconsider the case.

Regardless of whether the relationship be deemed formal or informal, the Honor Committee under its own procedures provides that a single "not guilty" vote by a member ends the matter, while a "guilty" finding confronts a cadet with the hard choice of either resigning or electing to go before a Board of Officers. An adverse finding there results not only in formal separation from the Academy but also in a damaging record that will follow the cadet through life. Accordingly, we conclude that the Cadet Honor Committee, acting not unlike a grand jury, is clearly part of the process whereby a cadet can ultimately be adjudged to have violated the Cadet Honor Code and be separated from the Academy. Therefore, the effect of the committee's procedures and determinations on the separation process is sufficiently intertwined with the formal governmental activity which may follow as to bring it properly under judicial review.

To support their claim of taint before the Board of Officers, appellants submitted statistics to show that between 1967 and 1972 there was only one successful appeal out of 150 "guilty" findings by the Cadet Honor Committee, and that only nine cadets chose Board of Officers' hearings over resignation. The statistics cover a time period before *Hagopian* required due process in the separation of a cadet from the Academy. We permitted augmentation of the record to show that during the 1973–74 academic year at the Academy, Boards of Officers found no violation in five of that year's ten separation hearings. In further support of the contention of taint, appellants argue that the Cadet Honor Committee findings had a prejudicial impact upon those members of the Boards of Officers who had been cadets themselves. There are no facts in the record to support this contention.[2] On

---

**2.** The record shows that in the hearing before the Board of Officers, the officers responded in the negative when asked by the lawyer who represented Andrews whether they would be influenced in any way by what had happened prior to the Board hearing.

the basis of mere assertion that a West Point officer, sitting as a member of the Board of Officers, cannot fairly consider the evidence against a West Point cadet, the court below properly rejected the request to take deposition testimony of the officers. The judicial process, taken after administrative fact-finding, does not lightly accept a challenge to the fairness of the hearing officer. See: Lopez v. Henry Phipps Plaza South, Inc., 498 F.2d 937 (2d Cir. 1974). Nor is judicial inquiry into the mental processes of the hearing officer favored. See: National Nutritional Foods Ass'n v. Food & Drug Administration, 491 F.2d 1141 (2d Cir. 1974).

 While it is clear that the proceedings before the Cadet Honor Committee were wholly lacking in procedural safeguards, we are unpersuaded by the record now before us that the Cadet Honor Committee hearing was a critical stage in the separation of appellants from the Academy for Honor Code violations. There is no evidence in the record that the decisions by the Cadet Honor Committee in any way influenced the members of the Boards of Officers. On the contrary, the record convinces us that the proceedings before the Boards of Officers were de novo and were as free from infection and taint as is a trial in which jurors are aware that the defendant before them has been indicted by a grand jury. We find, therefore, that the Cadet Honor Committee is a charging body whose decisions had no effect other than to initiate de novo proceedings before a Board of Officers. We further hold that the requirements of Wasson and Hagopian were met because each appellant was separated from the Academy only after he was afforded a hearing with full procedural safeguards. Accordingly, we conclude that on the basis of the record now before us, the Due Process Clause does not require the utilization of any particular procedure by the Cadet Honor Committee.

 We further find that the District Court correctly determined that segregation of cadets in Boarders Ward was a proper exercise of the discretionary authority of Academy officials. In this respect we are content to rely upon, in no way extending, the traditional doctrine that "[w]ith respect to decisions made by Army authorities, '[o]rderly government requires us to tread lightly on the military domain, with scrupulous regard for the power and authority of the military establishment to govern its own affairs within the broad confines of constitutional due process.'" Hagopian, supra, 470 F.2d at 208, quoting Friedberg v. Resor, 453 F.2d 935, 937 (2d Cir. 1971). And, as the District Court below noted, "[n]othing that happened to these plaintiffs in the Boarders' Ward . . . has the slightest bearing upon the question of whether these plaintiffs should be permitted to pursue their military careers, or has been shown to have had any effect on the manner in which the several boards of officers conducted the cases before them." White v. Knowlton, supra, 361 F.Supp. at 449.

 The charges of ignominy and alleged pressure to resign which appellants contend flow from "guilty" determinations by the Cadet Honor Committee are unsupported by the record. Ignominy suffered while at the Academy and injury to future officer careers after graduation of cadets who are found, after adverse Honor Committee findings, by a Board of Officers not to have violated the Cadet Honor Code, clearly raise important questions concerning the need for procedural safeguards at an initial hearing before the Cadet Honor Committee.[3] Because each appellant here was found by a Board of Officers to have violated the Honor Code and was separated from the Academy, the factual foundation upon which the above charges rest is not now before us. The appellants lack standing to assert such claim.

 The regulations which establish the administrative procedure in Honor

**3.** See Rose, supra, note 1, at 41–42, 139–43, 192.

Code cases also provide that in all cases where Boards of Officers find violations, and their findings are upheld on review, separation from the Academy must ensue. Appellants challenge the sole penalty of expulsion as a violation of administrative due process. The District Court, summarily rejecting this challenge, stated:

"The fact that a cadet will be separated from the Academy upon a finding that he has violated the Honor Code is known to all cadets even prior to the beginning of their careers there. The finding of a code violation by hypothesis includes a finding of scienter on the part of the offender. While separation is admittedly a drastic and tragic consequence of a cadet's transgression, it is not an unconstitutionally arbitrary one, but rather a reasonable albeit severe method of preventing men who have suffered ethical lapses from becoming career officers. That a policy of admonitions or lesser penalties for single violations might be more compassionate—or even more effective in achieving the intended result—is quite immaterial to the question of whether the harsher penalty violates due process." White v. Knowlton, *supra,* 361 F.Supp. at 449.

We agree with the court below and find that, while the penalty is severe, it is nevertheless reasonable and not arbitrary, and therefore does not violate due process.

Finally, we turn to appellant Andrews' challenge to the manner in which the written explanation of his alleged disciplinary infractions was obtained and later used against him in his separation from the Academy.

As part of the investigation of the alleged misconduct, Andrews was required to make two written explanations giving his version of the underlying circumstances. The second of those statements formed the basis of the Honor Code charges against him, since it set forth the alleged "lie" that the automobile was present on the Academy grounds for only fifteen or twenty minutes. An-drews contends that the warnings required by the rule enunciated in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), should have preceded the request that he submit his second written explanation, and that the failure to administer those warnings should have barred the use of his statement in the Honor Code violation hearings. The court below, without deciding if Andrews' situation was sufficiently custodial to have required *Miranda* warnings, adopted the government's contention that failure to give warnings cannot excuse subsequent false statements offered by a suspect in order to exculpate himself. The Court stated:

"The government analogizes the situation at bar to that where a person suspected of a crime perjures himself before a grand jury in the absence of Miranda warnings, and then seeks to prevent prosecution for perjury (by invoking the exclusionary rule) on the basis of absence of warnings. Such failure to warn does not require exclusion of the perjurious statement in the subsequent perjury prosecution. United States v. Winter (2d Cir. 1965, Judge Weinfeld) 348 F.2d 204; United States v. Ponti (E.D.Pa.1966) 257 F.Supp. 925; United States v. Provinzano (E.D.Wis.1971) 326 F.Supp. 1066. Were it otherwise, one would be well-advised to give false testimony, in the hope of avoiding prosecution for the offense originally charged with assurance that there could be no prosecution for the perjury by which such result had been achieved." Andrews v. Knowlton, *supra,* 367 F.Supp. at 1265.

 It is clear from United States v. Winter, *supra,* that the absence of warnings does not prevent prosecution for perjurious statements before a grand jury and by analogy, while the absence of warnings might prevent Andrews from being prosecuted for improperly being on campus or violating some other military regulation, his false statement is still subject to "prosecution" as a breach of the Honor Code. We agree with the District Court's finding that there was

no constitutional infirmity in the admission into evidence at Andrews' hearing of his second report.

Because matters outside the pleadings were considered by the District Court below, the motions to dismiss were treated as motions for summary judgment, as is required by Rule 12(b) of the Federal Rules of Civil Procedure. Carter v. Stanton, 405 U.S. 669, 92 S.Ct. 1232, 31 L.Ed.2d 569 (1972). We are satisfied that there are no genuine issues as to any material fact, and as a matter of law appellees are entitled to summary judgment. Accordingly, the orders (judgments) of the District Court are

Affirmed.