Midshipman First Class Robert O.
WIMMER, Appellee,

v.

The Honorable John F. LEHMAN, Jr.,
Secretary of the Navy, and Admiral E.C.
Waller, Superintendent, United States
Naval Academy, Appellants.

Midshipman First Class Robert O.
WIMMER, Appellant,

v.

The Honorable John F. LEHMAN, Jr.,
Secretary of the Navy, and Admiral E.C.
Waller, Superintendent, United States
Naval Academy, Appellees.

Nos. 82–1892, 82–1893.

United States Court of Appeals,
Fourth Circuit.

Argued March 7, 1983.

Decided April 28, 1983.

Jerome B. Richman, Annapolis, Md. (J.B. Stevens, Jr., Annapolis, Md., on brief), for appellee/cross-appellant.

Bruce G. Forrest, Civ. Div., Dept. of Justice, Washington, D.C., (CDR Donal M. Hill, Office of the Judge Advocate Gen., Dept. of the Navy, Alexandria, Va., J. Paul McGrath, Asst. Atty. Gen., Washington, D.C., J. Frederick Motz, U.S. Atty., Baltimore, Md., Anthony J. Steinmeyer, Civ. Div., Dept. of Justice, Washington, D.C., on brief), for appellants/cross-appellees.

Before WINTER, Chief Judge, ERVIN, Circuit Judge, and ALDRICH,* Senior Circuit Judge.

BAILEY ALDRICH, Senior Circuit Judge.

Midshipman Wimmer instituted this action on April 15, 1982 in the United States District Court for the District of Maryland seeking declaratory relief and a preliminary injunction. He sought to enjoin the Secretary of the Navy and the Superintendent of the United States Naval Academy at Annapolis from discharging him from the Academy, because of unsatisfactory conduct, and transferring him to the U.S. Naval Reserve and ordering him to three years active duty. The defendants had taken such action under the authority of 10 U.S.C. §§ 6959 & 6962 after an investigatory hearing at which Wimmer was found to have violated the Academy's delinquency code by the possession and use of marijuana. Wimmer contends that he was not accorded due process in that (1) his counsel's function at the hearing was restricted, and (2) he was refused a continuance until after a state criminal trial, arising out of the same events, had taken place. He further claims that the Secretary had no statutory authority to assign him to three years active service as an enlisted man. The district court found that Wimmer was likely to succeed on the merits of his two due process claims, but not on his statutory claim. Based on this, and other findings, it preliminarily enjoined Wimmer's discharge. The parties

filed interlocutory cross appeals, but agree that the record is complete and that we can make a final determination on the merits. Concluding that Wimmer is not entitled to relief on any of his claims, we reverse.

The background of the case is that in August, 1979 Wimmer signed an extensive document entitled "Statement and Acknowledgement of the Anti-Drug Abuse Policy of the U.S. Naval Academy." This read in part,

"I have been fully informed that the U.S. Naval Academy will not tolerate any drug abuse by a midshipman at any time or place whether in a duty, leave or liberty status or whether at the Naval Academy or elsewhere.

. . . .

"I have been informed that the Maryland State Law provides for imprisonment up to 5 years and/or a fine up to $15,000 for trafficking in marijuana. The mere possession of the minutest amount of marijuana is punishable under Maryland Law by both a fine and imprisonment of up to 1 year.

"Finally, I acknowledge my understanding that, in addition to the federal, state, and local criminal liabilities that may be incurred as a result of drug abuse, an involved midshipman, wherever and whenever the offense occurs, will also be subject to separation from the Naval Academy by the Secretary of the Navy for unsatisfactory conduct in accordance with 10 U.S.Code, section 6962."

Early in the morning of December 13, 1981 Wimmer was stopped by an officer of the Annapolis Police Department for running a red light. While requesting his license the officer observed, in plain view, what appeared, and ultimately proved, to be a small quantity of marijuana. Wimmer was taken to the station, and subsequently charged with possession. On December 18 he was notified by the Academy of an Investigative Hearing to make findings con-

*Of the First Circuit, sitting by designation.

cerning his alleged misconduct, the notice containing an extensive description of the charges, the procedures to be used, and of his rights. The notice informed him that he could have counsel present to advise him with respect to safeguarding his interests regarding his pending state criminal trial,[1] but that in all other respects he must conduct his own defense. He was informed that he might "testify or remain silent," which, contrary to usual practice, entitled him to the protection of the Fifth Amendment as much, or as little, as he saw fit, and that no inferences would be drawn against him.

The hearing was held on January 13, 1982. Wimmer's objections at the outset to the restrictions placed upon his attending counsel, and to the denial of the postponement, were overruled. Following the hearing the Investigating Officer filed a written summary of the evidence (agreed, for present purposes, to constitute the complete factual record for appeal) and made findings that Wimmer was guilty of the offenses charged. This report was forwarded to the Commandant of Midshipmen, who then held a hearing at which Wimmer was allowed to attend and present additional evidence if he desired. He attended, but offered none. The Commandant upheld all rulings of the Investigating Officer, and, based on all the evidence, recommended to the Superintendent that Wimmer be discharged from the Academy. The Superintendent, in turn, recommended to the Secretary that Wimmer be discharged from the Academy and be transferred to the Naval Reserve for active duty in an enlisted status for three years. The Secretary adopted these recommendations and this action followed.

*Due Process—Procedure*

■ Concededly, Wimmer could not be deprived of the opportunity to obtain his commission without procedural due process. What process is due is not so clear. It is a commonplace that, except in certain standard situations, "due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). *See, also Goss v. Lopez,* 419 U.S. 565, 577–78, 95 S.Ct. 729, 738, 42 L.Ed.2d 725 (1975); *Hagopian v. Knowlton,* 470 F.2d 201, 207–08 (2 Cir.1972). We also note the Court's phraseology in *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), which requires consideration of

> "the risk of an erroneous deprivation of [his] interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards . . . ."[2]

What is at issue here is not access to counsel, but, specifically, the opportunity to have counsel, instead of oneself, examine and cross-examine witnesses, make objections,[3] and argue the case at the hearing level.[4] No other limitation was imposed. Prior to the hearing, Wimmer was given full notice of the charges, a copy of the arresting officer's report, a copy of the report of the Naval Investigative Service officer who interviewed Wimmer, and a copy of the chemical analysis. At the hearing he was permitted to question witnesses called by the Investigating Officer, to present evidence and witnesses of his own and, in general, to conduct a full defense.

Viewed a priori, to say that an individual of a midshipman's presumed intelligence, selected because he is expected to be able to

1. Cf. *Gabrilowitz v. Newman,* 582 F.2d 100 (1 Cir.1980).

2. The court pointed out that any showing in this respect was to be balanced against the government's interest in maintaining the procedure it adopted. We do not find it necessary to stress this factor, except to say that the Navy's interest in a relatively informal procedure, provided it is fairly conducted, is obvious.

3. Under the Naval Investigative Hearing procedure, objections are not argued, but are merely noted on the record and resolved by the Commandant.

4. Counsel was permitted to submit an extensive written presentation to the Secretary of the Navy in connection with the last step of Wimmer's appeal.

care for himself and others, often under difficult circumstances, and who has full awareness of what he is facing, with counsel's advice, is deprived of due process by being required to present his defense in person at an investigatory hearing is not persuasive. *See Hagopian v. Knowlton,* 470 F.2d, ante, at 211–12. The hearing was non-criminal, and was conducted in a non-adversarial manner; there was no opposing counsel, and the hearing was conducted entirely by the Investigating Officer. Wimmer would make much of the fact that he was exposed to criminal liability, but that mere fact, apart from possible prejudice to his criminal defense, post, cannot change the intrinsic nature of the hearing. Absent some special showing, post, we see no due process infringement. *See Wasson v. Trowbridge,* 382 F.2d 807 (2 Cir., 1967). *Cf. Sohmer v. Kinnard,* 535 F.Supp. 50 (D.Md., 1982); *Kolesa v. Lehman,* 534 F.Supp. 590 (N.D.N.Y.,1982).

*Due Process—Prejudice*

█ Wimmer's claimed prejudice, put simply, is the loss of an attorney's special ability to elicit favorable testimony from witnesses.

At the hearing, following the arresting officer's testimony, Special Agent Curley of the NIS testified to interviewing Wimmer the day following his arrest. He stated that Wimmer executed a waiver, post, and then admitted possessing marijuana, and sharing it on several prior occasions with other, unnamed, midshipmen. When questioned by Wimmer, Curley testified that after Wimmer's confession he said he might try to help him with the state officers, but that there was no talk or promises about any Academy "deals."

5. The paper, prominently labelled MILITARY SUSPECT'S ACKNOWLEDGEMENT AND WAIVER OF RIGHTS, stated,
"I have been advised by Special Agent(s) P.J. Curley that I am suspected of use, possession and/or transfer of Marijuana, narcotics, and/or dangerous drugs.·
"I have also been advised that:
(1) I have the right to remain silent and make no statement at all;
(2) Any statement I do make can be used against me in a trial by court-martial or other judicial or administrative proceeding;

One Burke, a state officer, testified to a conversation with Wimmer about a possible state arrangement if he and his companions would help identify suppliers, but he, likewise, said nothing about Academy internal procedures.

On his own behalf, Wimmer testified about state police talk of possible cooperation, and that he assumed, when contact was made with him by Curley, that it was part of a deal that included the Academy. When questioned by the Investigating Officer about the waiver form he signed,[5] he said he thought it "just an official way of handling the problem" and that he did not realize his statements really would be used against him. He testified that Curley told him that he could make no promises about the Commandant, but that "things would go easier on me if I was up front." He refused to answer all direct questions about use or possession of marijuana, or the truth of statements he had made, citing his Fifth Amendment right to remain silent.

The Investigating Officer found the facts to be in accordance with Wimmer's confession as testified to by Curley. With regard to the claim that Wimmer had made the statement in the belief that it would not be used against him, the Investigating Officer stated,
"I inquired thoroughly into Respondent's assertions that he believed no adverse use would be made of his confession if he cooperated. I found absolutely no proof that anyone associated with the Naval Academy had attempted to persuade Respondent to confess by promising or even implying that his admissions would not be used against him."

"I understand my rights as related to me and as set forth above. With that understanding, I have decided that I do not desire to remain silent, consult with a retained or appointed lawyer, or have a lawyer present at this time. I make this decision freely and voluntarily. No threats or promises have been made to me."
In addition to signing directly under the last paragraph, Wimmer's initials were placed against the numbered paragraphs.

The district court reached a different conclusion.

"Wimmer contends that the confessions were given on the strength of implicit or explicit assurance by Burke and Curley that no use would be made of them by the Academy, and that Wimmer would be subject to no Academy discipline for his use of the marijuana. Burke and Curley deny making any such promises. Whether these promises were made and whether, if made, it was reasonable for Wimmer to rely on them, are crucial, because Wimmer was aware that the Academy's penalties for marijuana use were severe.

. . . . .

"[F]ull cross-examination by counsel of Burke and Curley might well have elicited facts to support Wimmer's contention that he made his confession pursuant to a promise that no proceeding at all would be brought against him by the Navy if he confessed. This, then, is much more than merely using the confession as evidence against him. If the promises had been made, the validity of the entire administrative proceeding would be suspect. Harmless error, therefore, is not an appropriate doctrine on this record."

We do not know what Wimmer's counsel may have said with regard to the record, but we must find these suppositions totally unwarranted. Passing the fact that no promise by Burke could bind the Academy, Wimmer, surely his own most favorable witness, testified to no such promises, by either Burke or Curley. Quite apart from the disclaimer in his written waiver, which it is difficult to think any finder of fact could overlook, on Wimmer's own testimony Curley told him he could make no promises about the Commandant. A statement, "I can't make any promises for the Commandant, but things will go better for you if you are up front," is an express denial of a promise, and, insofar as prophecy, is certainly not that no proceedings will be brought against him by the Navy. Indeed,

as a prophecy it can be said to have been borne out, since there was no court martial, as there could well have been. We cannot think that even the most skillful cross-examiner could have elicited statements from Curley that Wimmer testified were affirmatively disclaimed. So far as Burke was concerned, there is equally no reason to assume that counsel could have elicited from him anything more favorable than Wimmer's own testimony of what was said; in other words, nothing of substance.

Our appraisal of the record is confirmed by Wimmer's counsel's extensive letter of March 29 to defendant Secretary, in effect a brief on final appeal.[6] In it counsel dealt with Wimmer's alleged prejudice from being deprived of the full use of counsel as follows.

"If counsel had been permitted to assist Midshipman Wimmer in the examination of witnesses and the presentation of evidence, Midshipman Wimmer could have more fully developed . . . that *Officer Burke would cause the State charges to be dismissed* against Midshipman Wimmer if he cooperated and worked as an informant . . . [and that Wimmer] believe[d] that cooperation with NIS Agent Curley was expected of him by Officer Burke as part of the cooperation he, Burke, required . . . ." (Emphasis suppl.)

There was no suggestion in this letter of loss of any opportunity of developing promises by anyone of Naval clemency.

In sum, we are of the opinion that the Academy's Investigative Hearing procedure does not offend due process, but that, even if we are mistaken, the deprivation of examining counsel was harmless error as a matter of law in the present case.

*Due Process—Failure to Await State Proceedings*

■ There can be no claim that Wimmer's state trial suffered from the fact that the Naval hearing preceded it, since he was

---

6. There had been an intermediate proceeding, a hearing before the Commandant on January 25, at which Wimmer was afforded the opportuni-

ty to introduce further evidence, but offered none.

found not guilty.[7] Nor can we see how the overhanging threat of these proceedings prejudiced Wimmer at the hearing. In his brief Wimmer, largely quoting from the district court's opinion, says,

"Wimmer was thus faced with a difficult decision. If he chose to testify fully at the administrative hearing he could very well have been prejudiced in the defense of his State criminal case. Likewise, this testimony could also be used against him in a courts martial. On the other hand, if he testified only partially, (as in fact he did) he might very well prejudice his defense to the administrative charges."

The basis of this claim is not explained, nor is it readily apparent. Since no inferences were to be drawn against him from silence, it is difficult to see how it could have helped him to waive the Fifth Amendment and, by testifying fully, admit the offense. If, on the other hand, he was prepared to deny the offense, this could not have prejudiced him at the criminal trial.

Counsel's letter to the Secretary indicates that Wimmer may have desired to testify in mitigation of the offense; claiming, for example, that the reason he used marijuana was due to peer pressure. This would scarcely seem an excuse; his strong duty was to exert pressure in the opposite direction. But the first problem with this argument is that the purpose of the first hearing was only to decide guilt or innocence of the charge; Wimmer would have gained nothing by offering excuses for his conduct there.[8] The more basic problem, however, is that any argument predicated on the assumption that Wimmer committed the offense, but did not want to admit it until after the criminal trial, must, ipso facto, mean that he concedes its commission. That the Navy should have to adapt its procedures to fit the personal convenience of someone who had broken one of its important rules because he had corresponding difficulties with the state should answer itself.

In any event, difficult choices are imposed upon defendants and litigants in many situations. *See, e.g., McGautha v. California,* 402 U.S. 183, 213–20, 91 S.Ct. 1454, 1470–1474, 28 L.Ed.2d 711 (1971), *vacated on other grounds,* 408 U.S. 941, 92 S.Ct. 2873, 33 L.Ed.2d 765; *United States v. White,* 589 F.2d 1283, 1286–87 (5 Cir., 1979); *Arthurs v. Stern,* 560 F.2d 477 (1 Cir., 1977). Even if the overhanging threat of the criminal trial created some hard choices for Wimmer at the hearing, the Navy's strong interest in concluding its proceedings preclude delay due to Wimmer's state case. Provided it respected his Fifth Amendment rights, which it more than fully did, both by drawing no inferences, and by permitting the limited presence of counsel, *Gabrilowitz v. Newman,* 582 F.2d 100 (1 Cir., 1980), it owed him no duty to subordinate its general interests. Cases ante. The district court's conclusion that "fundamental fairness required a continuance under these circumstances," is unsupported by the authorities, and cannot stand.

*Assignment to Active Duty*

**[4]** Acting under 10 U.S.C. § 6959 the Secretary transferred Wimmer to the Naval Reserve and ordered him to active duty for a period of three years. This section provides

(a) Each midshipman ... shall sign an agreement that, unless sooner separated, he will—

(1) complete the course of instruction at the Naval Academy;

(2) accept an appointment and serve as a commissioned officer ....

. . . . .

(b) A midshipman who does not fulfill his agreement under subsection (a) may be transferred by the Secretary of the Navy to the Naval Reserve or the Marine Corps Reserve in an appropriate enlisted grade or rating, and ... may be ordered to active duty to serve in that grade or rating for such period of time as the Secretary prescribes but not for more than four years."

---

**7.** This finding resulted from the state's failure to have one of its exhibits available and the court's refusal of a postponement.

**8.** But see n. 6, ante.

The parties disagree as to subsection (b)'s applicability. The Secretary contends that Wimmer did not "complete the course of instruction," hence he did not "fulfill his agreement," and hence he "may be ordered to active duty." Wimmer replies that all of these provisions are dependent upon the clause in subsection (a), "unless sooner separated," which, of course, is true. The Secretary argues that the phrase means separated from the Navy, and, since Wimmer was separated only from the Academy, subsection (b) still applies. In his initial brief Wimmer agreed that the phrase means separated from the Navy, but argued that under section 6962,[9] pursuant to which he was separated from the Academy, he was, perforce, separated from the Navy as well. This would construe section 6962's final language, "he may discharge the midshipman from the Naval Academy and from the naval service," as denying to the word "and" any meaning other than conjunctive. Not only would this make the total phrase repetitive, since a discharge from the service would necessarily effectuate a discharge from the Academy, and hence would be a construction to be avoided, *e.g., Colautti v. Franklin,* 439 U.S. 379, 392, 99 S.Ct. 675, 684, 58 L.Ed.2d 596 (1979); *Jarecki v. G.D. Searle & Co.,* 367 U.S. 303, 307–08, 81 S.Ct. 1579, 1582, 6 L.Ed.2d 859 (1961), but, by denying the Secretary a choice, would produce an unreasonable result. The fact that an individual is discharged from the Academy, or is found to possess "insufficient aptitude to become a commissioned officer in the naval service," does not necessarily mean he could not be competent seaman. It would be a great waste for the government to lose its investment in training what proved to be unsatisfactory midshipmen if it could not put them in a lesser spot which they were capable of filling. To construe section 6962 as necessarily requiring discharge from the entire service would produce a purposeless and most unfortunate result. The district court rejected it, and we agree.

In his reply brief Wimmer shifts his reasoning, and asserts that prior to the addition of subsection (b), "unless sooner separated" logically only meant unless sooner separated from the Academy, and since he was in fact separated from the Academy, subsection (b) cannot apply. This produces no better sense.

We are aware that the contrary result has been reached in the Third Circuit in *Dougherty v. Lehman,* 688 F.2d 158 (3 Cir., 1982), through an extensive analysis of what, to us, is less than conclusive legislative history. With respect, we are unable to follow the court's reasoning, including its final observation that it might reach a different result if the midshipman committed the particular misconduct for the express purpose of being discharged and avoiding his obligations. Although such an exception would seem better than never allowing the Secretary a freedom of choice, we see nothing in the statutory language that could cause its meaning to depend upon the midshipman's subjective intent. We are particularly troubled by the court's dismissal, as "plainly erroneous or inconsistent with the [statute]," Naval regulations which it concedes

"unequivocally read § 6959 to authorize the action taken in this case.[7]

[7] *See* Department of Defense Directive 1332.-23 § V.A.2; Bureau of Naval Personnel Manual, art. 3850400, §§ 3, 6.b(4)."

The worst we could say is that there may be an ambiguity. In these circumstances we

---

9. "(a) The Superintendent of the Naval Academy shall submit to the Secretary of the Navy in writing a full report of the facts—

(1) whenever the Superintendent determines that the conduct of a midshipman is unsatisfactory; or
(2) whenever the Academic Board unanimously determines that a midshipman possesses insufficient aptitude to become a commissioned officer in the naval service.

(b) A midshipman upon whom a report is made under subsection (a) shall be given an opportunity to examine the report and submit a written statement thereon. If the Secretary believes, on the basis of the report and statement, that the determination of the Superintendent or of the Academic Board is reasonable and well founded, he may discharge the midshipman from the Naval Academy and from the naval service." 10 U.S.C. § 6962.

will not reject the Navy's interpretation. *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965).

Reversed.