18-2996
Isiah M. Doolen v. Christine Wormuth, et al.

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2020

(Argued: June 2, 2021                    Decided: July 20,2021)

Docket No. 18-2996

_____

ISIAH M. DOOLEN,

*Plaintiff-Appellant*,

v.                                        18-2996

CHRISTINE WORMUTH, IN HER OFFICIAL CAPACITY AS
SECRETARY OF THE ARMY, LIEUTENANT GENERAL DARRYL
A. WILLIAMS, IN HIS OFFICIAL CAPACITY AS
SUPERINTENDENT OF THE UNITED STATES MILITARY
ACADEMY,

*Defendants-Appellees.*[1]

_____

Before: POOLER, NARDINI, *Circuit Judges*, and KAPLAN, *District Judge.*[2]

[1] Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Christine Wormuth is automatically substituted as Defendant-Appellee.

[2] Judge Lewis A. Kaplan, United States District Court for the Southern District of New York, sitting by designation.

Appeal from the September 11, 2018 judgment of the United States District Court for the Southern District of New York (Briccetti, *J.*) granting the government's motion to dismiss and, in the alternative, for summary judgment, on Plaintiff-Appellant Isiah M. Doolen's claims that the cadet separation procedures of the United States Military Academy at West Point fail to provide due process and that Doolen's separation proceedings violated West Point's own regulations in a manner that substantially prejudiced him. We conclude that West Point's cadet separation procedures satisfy due process and that the intra-military immunity doctrine, which bars judicial interference in discretionary military personnel decisions, renders Doolen's regulatory claims nonjusticiable.

Therefore, we AFFIRM the judgment of the district court.

_____

EDWARD G. WILLIAMS, Stewart Occhipinti, LLP, New York, N.Y., *for Plaintiff-Appellant*.

PETER ARONOFF, Assistant United States Attorney (Benjamin H. Torrance, Assistant United States Attorney, *on the brief*), *for* Audrey Strauss, United States Attorney for the Southern District of New York, New York, N.Y., *for Defendants-Appellees*.

POOLER, *Circuit Judge*:

Isiah M. Doolen is a former cadet at the United States Military Academy at West Point. On October 21, 2015, following a disciplinary hearing, the Deputy Assistant Secretary of the Army, Military Personnel and Quality of Life, acting as the Secretary of the Army's designee, approved West Point's recommendation to separate Doolen and ordered Doolen to pay recoupment to the government of $226,662.00, the cost of Doolen's West Point education. Doolen sued the Secretary of the Army and the Superintendent of the United States Military Academy ("Defendants-Appellees") in federal court, claiming that (1) the applicable cadet removal procedures fail to provide due process and (2) Defendants-Appellees failed to follow West Point's own mandatory regulations in resolving Doolen's case, causing him substantial prejudice. The district court granted the government's motion to dismiss, and, in the alternative, for summary judgment, on all of Doolen's claims. Doolen appealed.

We conclude that West Point's cadet separation procedures satisfy due process and that the intra-military immunity doctrine, which bars judicial interference in discretionary military personnel decisions, renders Doolen's

regulatory claims nonjusticiable. Therefore, we AFFIRM the judgment of the district court.

**BACKGROUND**

Doolen challenges the constitutionality of the disciplinary procedures that led to his separation from West Point in October 2015. Therefore, we begin with an outline of the procedures guiding cadet discipline and adjudicating punishments for any infractions. As discussed below, not every single infraction is subject to formal disciplinary proceedings—known as Article 10 proceedings— but Doolen's troubled history at West Point involved multiple serious infractions and, accordingly, multiple Article 10 proceedings.

## I.     Cadet Disciplinary Procedures

The Army has issued a series of regulations that govern the suspension and separation of cadets from West Point. One regulation provides "policy and procedures for the general governance and operation of the United States Military Academy," including procedures for cadet discipline and cadet separation from the Academy. Army Reg. 210-26 ¶ 1-1. Two other sets of regulations provide more detailed guidance on cadet disciplinary proceedings.

4

*See* United States Corps of Cadets ("USCC") Regs. 351-1, 351-2. One of those regulations, USCC Regulation 351-1, contains the Cadet Disciplinary Code ("CDC"), which lists a variety of substantive offenses in Articles 1 through 9 and authorizes commanders to impose punishment on cadets in Article 10. *Id.* 351-1 ¶ 119. Additional guidance is available in the USCC Standing Operating Procedure ("SOP").

Generally, each cadet is considered either proficient or deficient in conduct. A cadet must be proficient to graduate. USCC Reg. 351-2 ¶ 501. Deficiency means exhibiting "conduct [that] is a substantial departure from the standards of conduct expected of members of the Corps of Cadets." *Id.* ¶ 504. Deficiency may lead to a cadet's separation if "the retention of [the] cadet is not considered to be in the best interests of the Corps of Cadets, the Military Academy or the United States Armed Forces." *Id.* ¶ 312(b).

Cadet discipline always involves input from the cadet's chain of command. Each company within the Corps of Cadets is commanded by a commissioned officer of the Army, known as a "tactical officer." Army Reg. 210-26 ¶ 1-19(c). Tactical officers command at the company, battalion, regimental,

5

and brigade levels and are authorized to impose various levels of punishments on cadets. USCC Reg. 351-2 tbl. 1-2. As a general rule, commanders are to "use the least severe means sufficient to solve a disciplinary problem." *Id.* ¶ 102. Accordingly, less serious violations may be resolved through nonpunitive remedial measures, including on-the-spot corrections, counseling, extra training, and adjustment of performance grades. *Id.* ¶ 103. Commanders may punish more serious infractions under Article 10 of the CDC. *Id.* ¶ 104; *see also id.* 351-1 ¶ 119, art. 10. Attached to this opinion is a Sequence of Actions Timetable available within USCC Regulation 351-1 that may be helpful to reference while reviewing the components of an Article 10 proceeding, described below.

To initiate formal disciplinary proceedings under Article 10, a commander provides a cadet with written notice of the alleged infraction. *See id.* 351-2, Form 2-3. The cadet chooses whether to appear for a hearing, at which the cadet may present evidence in defense, extenuation, or mitigation of the disciplinary charges. *See id.* If the commander or designee conducting the hearing finds the cadet guilty of the alleged misconduct, the commander may impose various types of punishments on the cadet, including reprimand, withdrawal of

6

privileges, or suspension. *See id.* The commander also must advise the cadet of the right to appeal the finding. *See id.*

Guilty cadets automatically incur demerits. *Id.* ¶ 105. Cadets have a maximum allowance of demerits within a six-month period based on their seniority, *see id.* tbl. 1-4, and a cadet who exceeds the applicable maximum may be subject to a more comprehensive conduct review, *see id.* ¶¶ 105, 502. Two alcohol policy violations may also trigger a conduct review. *See id.* ¶ 504(b)(3). During a conduct review, a cadet's chain of command opines on the cadet's overall conduct and recommends whether to maintain the cadet's conduct standing or refer the cadet to a conduct investigation ("CI") for further action. *See id.* ¶ 502.

CIs are non-adversarial hearings where an investigating officer ("IO") determines whether a cadet is proficient or deficient in conduct. *See id.* 351-1 ¶ 101. Prior to the hearing, a cadet is informed of the date of the hearing and all of the cadet's rights in connection with the review process. *See id.* ¶ 203. Cadets' rights include the following: to receive written notice of the alleged deficiency and a list of all the actions being investigated; to have a "reasonable period of

7

time to prepare for the CI"; to consult with legal counsel, who may help prepare a cadet for the hearing but may not represent the cadet at the hearing; to be present during the hearing or not to appear for it; to testify or to remain silent; to examine all documents to be considered by the CI; to make evidentiary objections; to call "reasonably available witnesses" and question and cross-examine witnesses; to present relevant evidence; and to receive a complete copy of the CI's findings and recommendations. *Id.* ¶ 105. No witnesses at the CI may testify as to whether the cadet should be retained or separated. *See id.* fig. 2-6 ¶ 4. The IO's findings "will either confirm the deficiency in conduct and render a recommendation for disposition to the chain of command or will find the cadet proficient in conduct." *Id.* ¶ 102(f).

After the CI, the Commandant, "the immediate commander of the Corps of Cadets," 10 U.S.C. § 7434(c), reviews the IO's findings and the entire record, USCC Reg. 351-2 ¶ 509. In preparation, the Regulations and Discipline Officer first forwards the complete CI record to the Staff Judge Advocate ("SJA"), who determines whether any legal errors have materially affected the proceeding and confirms that the IO's findings are supported by the evidence presented. *Id.* 351-1

8

¶ 502(a)(3). After this "initial review," the SJA returns the packet to the Regulations and Discipline Officer, who forwards the entire packet to the Commandant. *Id.* ¶ 104, Sequence of Actions Timetbl.

If the cadet was found deficient, the Commandant may either place the cadet on conduct probation or forward a report to the Superintendent, who is "the commanding officer of the Academy and of the military post at West Point," 10 U.S.C. § 7434(b), for action, USCC Reg. 351-2 ¶ 509. If the Commandant chooses to forward the case to the Superintendent, the Regulations and Discipline Officer must first send the case packet, now with the Commandant's recommendation, back to the SJA. *Id.* 351-1 ¶ 114(m). If the SJA finds no legal objection within the record, the SJA will serve a copy of the SJA's review on the cadet, who has 72 hours to submit a written response to the entire packet. *Id.; see also id.* ¶ 104, Sequence of Actions Timetbl. Together with the cadet's comments, if any, the entire record is sent to the Superintendent. *Id.* ¶ 104, Sequence of Actions Timetbl.

The Superintendent, in turn, may direct the cadet's retention with or without probation, transfer to a lower class, or suspension. *Id.* 351-2 ¶ 509. If the

9

Superintendent instead decides separation is appropriate, the Superintendent must recommend it to the Secretary of the Army, the only officer authorized to direct separation. *Id.* ¶ 513(d). However, the Secretary has delegated separation authority to certain other positions at Army Headquarters. After a cadet enters the Second Class year (junior year), the applicable separation authority is the Deputy Assistant Secretary of the Army (Military Personnel and Quality of Life). Army Reg. 210-26 tbl. 7-2. If the delegated authority enters an order of separation, the cadet may appeal to a civilian review board, the Army Board for the Correction of Military Records ("ABCMR"), which may conduct an evidentiary hearing and accept new evidence. *See* 32 C.F.R. § 581.3(c)(2)(iii); *see also* 10 U.S.C. § 1552(a)(1) (explaining that "[t]he Secretary of a military department may correct any military record" if it is "necessary to correct an error or remove an injustice" through "boards of civilians of the executive part of that military department"). The ABCMR's decision is reviewable in federal court. *See* 10 U.S.C. § 1558(f).

Because West Point cadets receive a college education at no cost to them, they must sign agreements requiring them to repay the cost of their education if

10

they do not complete the educational program or a period of active duty. *See id.* § 2005(a)(3). Separated cadets are considered in breach of their service agreement, Army Reg. 210-26 ¶ 7-9, tbl. 7-1, and thus "shall repay to the United States an amount equal to the unearned portion of the bonus or similar benefit," 37 U.S.C. § 303a(e)(1)(A). A "bonus or similar benefit" includes an educational benefit. *Id.* § 303a(e)(5)(A).

## II.     Factual Background

In 2006, Doolen enlisted in the Army National Guard for a period of six years. Doolen also enlisted in the Army Reserve as a cadet in the New Mexico Military Institute's Reserve Officer Training Program. After two years at the Institute's college program, Doolen entered the United States Military Academy Preparatory School. Following that, Doolen enrolled in the Academy at West Point as a member of the class of 2013. Doolen's tenure at West Point included multiple disciplinary infractions and proceedings. Over the course of his time there, Doolen was subject to proceedings related both to alcohol violations and accumulation of excessive demerits.

11

During Doolen's second semester at West Point, he snuck alcohol into the barracks using a Taco Bell cup and a water bottle. Drinking or possessing alcohol on the West Point Military Reservation without specific authorization from the Commandant is considered "Major Misconduct." Army Reg. 210-26 ¶ 6-7. Doolen underwent disciplinary proceedings at the Brigade level for this infraction, was found guilty, and was subjected to a number of punishments, including 35 demerits.

By February 2013, Doolen, who was in his First Class Year (senior year) at the Academy, had accumulated 90 demerits, which exceeded his six-month demerit maximum allowance of 72. This triggered a CI. Major Timothy Carignan, the IO of that CI, found Doolen deficient in conduct and recommended "suspended separation through a delayed graduation." App'x at 828. As part of that hearing, multiple officers in Doolen's chain of command opined on Doolen's conduct. Doolen's Company Tactical Officer ("CTO") recommended immediate separation from the Academy. The Brigade Tactical Officer ("BTO") also recommended separation. Brigadier General Richard D. Clarke, the Commandant of Cadets, recommended Doolen be separated and discharged

12

from the Army and required to pay recoupment for his education expenses.

Doolen was given the full record, along with the SJA's legal review, and he submitted a rebuttal, dated May 3, 2013.

Five days later, while the ultimate resolution of the CI was still pending, Doolen stumbled into the barracks of Cadets Jillian Collins and ND, his former girlfriend, and approached ND.[3] Cadet Collins wrote in a sworn statement that, at first, she expected a typical argument between ND and Doolen, something "that they [were] known for throughout this school year[,] and that they would go away quickly." App'x at 568. Doolen asked ND why she had stopped speaking to him and returned his belongings to him. ND shrugged her shoulders and told Doolen to leave, at which point Doolen started cursing and yelling at her, calling her a "F$%#ing Whore." App'x at 568. ND attempted to take the argument into the hallway, but Doolen grabbed her and physically blocked her from leaving. ND nevertheless managed to get out of the room, where Doolen continued to yell and blocked the door so that ND could not get back inside. ND

---

[3] Cadet ND's initials were substituted for her full name pursuant to a protective order in district court.

13

then raised her voice and asked bystanders for help. People started to pay attention to the altercation, at which point Doolen angrily stormed away, while "becoming physical with inanimate objects." App'x at 568. According to Collins, Doolen appeared intoxicated during the encounter; he was stumbling, slurring his words, and smelled of alcohol.

On May 13, 2013, Army Superintendent, Lieutenant General David H. Huntoon, Jr., completed his review of Doolen's CI, which, at that point, did not reference Doolen's altercation with ND. General Huntoon concluded that a call to active duty would not be appropriate and recommended separation and discharge. He suspended Doolen from the Academy until final action could be taken by Army Headquarters. He also recommended an investigation into whether Doolen had breached his service requirement and would be required to pay recoupment of his education benefits. In November 2013, the investigation concluded that Doolen should repay $203,160 in education benefits. In March 2014, Doolen filed objections to the proceedings and pointed out some procedural irregularities. The Office of the Judge Advocate General raised legal objections to the CI and Doolen was reinstated as a cadet and returned to the

14

Academy in June 2014. The specific procedural deficiencies are unclear from the record. However, Doolen was warned that, upon his return to the Academy, new disciplinary actions could be taken for the May 8, 2013 incident with ND.

Indeed, after Doolen returned to West Point, Article 10 proceedings were commenced in relation to the May 8, 2013 incident. Doolen was notified that the CI would consider his violations of Articles 1, 6, and 7, the IO would evaluate the evidence by a preponderance of the evidence standard, and Doolen could speak and present evidence and witnesses on his behalf. The proceedings occurred on June 10, 2014, at the brigade level. Doolen was found guilty and indicated that he would not appeal the finding.

On July 9, 2014, Doolen's tactical officer recommended that he be referred to a CI for a deficiency hearing for receiving two alcohol-related Article 10 violations. On July 17, 2014, the Regulations and Discipline Officer notified Doolen via memorandum that he would be referred to a CI for a reported conduct deficiency for "Receiving Two Alcohol Boards." App'x at 548. Doolen elected to appear for the CI and indicated that he intended to dispute the board proceedings and would present witnesses. Doolen wrote a memorandum, dated

15

July 29, 2014, contesting the validity of the June 2014 Brigade board proceeding. Namely, Doolen argued that the IO was biased and intentionally left out evidence pertaining to his alcohol consumption the night of the May 8, 2013 incident, he was not notified that the June 2014 proceeding would be considered an alcohol board, and Brigadier General Clarke was biased because of his previous recommendation for Doolen's separation.

In August 2014, Captain Nicholas Forlenza was appointed as the IO for Doolen's upcoming CI. During the hearing, Doolen again indicated that he did not believe that his most recent Article 10 proceeding was an alcohol board. Doolen called Colonel Nick Mauldin, the BTO who imposed the second Article 10 proceeding against Doolen, as a witness. However, Doolen only asked Mauldin about his finding that Doolen had consumed alcohol the night of the May 8, 2013 incident, not about whether the Article 10 proceeding was an alcohol board. When the IO asked Mauldin about the latter issue, Mauldin stated that the proceeding was "[a]bsolutely" an alcohol board and referenced the fact that Doolen had admitted that he had consumed alcohol that night. App'x at 387. Doolen also called multiple witnesses to provide testimony about his character.

16

For example, Cadet William Majors, who had known Doolen for three months, testified that Doolen was focused on his duties and a good leader to the class of 2017. Cadet Elliot Chal, who had also known Doolen since June 2014, testified that Doolen never lost his temper and was professional throughout his interactions with him.

On August 30, 2014, Forlenza found Doolen deficient. In his written decision, Forlenza concluded that the second Article 10 proceeding was, in fact, an alcohol board. Forlenza also found that Doolen "has not demonstrated that he possesses the attributes essential to lead as an officer in the United States Army," citing his lack of self-control, disciplinary record, and below average academic performance. App'x at 495. Forlenza also noted that almost all of Doolen's character witnesses had only known him for three months, and the one witness who had known him from before his original suspension testified that "she did not trust him, nor would she willingly go to combat with him." App'x at 495. Despite expressing some accountability for his actions, Doolen, according to Forlenza, "is immature, selfish, and exhibits an attitude that is not compatible

17

with good order and discipline, the basic foundation for service in the United States Army." App'x at 496. Forlenza recommended separation.

In October 2014, Doolen received a copy of the CI, legal review, chain of command recommendations, and updated recoupment paperwork. Doolen subsequently submitted a response to the IO's findings and recommendations. Doolen's counsel suggested that Forlenza was not impartial during the proceedings and did not accurately summarize the import of all the witness testimony.

While the separation process was still pending, Doolen's tactical officer received an email from a civilian who alleged that Doolen was abusive to her and that Doolen had told her he used heroin with another cadet. A military prosecutor concluded that probable cause existed to support the assault allegation but not the allegation that Doolen used illegal drugs. Doolen's counsel later informed the SJA that the civilian had brought an action for a temporary restraining order against Doolen in family court but had since withdrawn her petition.

In March 2015, the SJA completed the legal review of the CI and recommended approving the IO's findings and forwarding Doolen's case to the Secretary of the Army for separation. Later that month, the Superintendent, Lieutenant General Robert L. Caslen, Jr., approved the IO's findings and recommended separation. He noted that Doolen should pay recoupment of his educational benefits in the amount of $226,662. In October 2015, the separation authority, Deputy Assistant Secretary of the Army, Military Personnel and Quality of Life, Anthony J. Stamilio, approved the recommendation to separate Doolen and directed Doolen to pay $226,662 in recoupment to the United States.

### III. District Court Decision

Doolen brought suit in federal court. The district court granted the government's motion to dismiss Doolen's second amended complaint, or, in the alternative, for summary judgment, pursuant to Federal Rules of Civil Procedure 12(b)(1), (b)(6), and 56. *Doolen v. Esper*, No. 16 CV 8606 (VB), 2018 WL 4300529, at *1 (S.D.N.Y. Sept. 10, 2018). The court held that it had jurisdiction to resolve Doolen's facial challenge to West Point's separation proceedings under the Fifth Amendment and the Administrative Procedure Act ("APA") because the claim

19

fell within one of the exceptions to the intra-military immunity doctrine, which generally protects the government from suit relating to military service. *Id.* at *5. As for Doolen's claim that West Point failed to follow its own mandatory regulations, the district court held that it would first have to determine whether the violations caused substantial prejudice. *Id.* at *6.

On the latter question, the court found that some of the regulations to which Doolen pointed were not mandatory procedural rules at all; any violations of the regulations did not cause substantial prejudice; and some of the asserted regulations did not even create procedural rights and therefore fell outside the scope of the applicable exception to the intra-military immunity doctrine. *Id.* at *7-10. On the question of whether Forlenza properly applied West Point's preponderance of the evidence standard, the district court held that the question essentially "require[d] the wholesale reconsideration of a discretionary military personnel decision," which the court could not do. *Id.* at *10. As for the facial challenges to West Point's separation procedures, the district court held that the existence of both pre-deprivation (the CI hearing) and post-deprivation (appeal

20

to the ABCMR) procedures satisfied both the Fifth Amendment's and the APA's due process requirements. *Id.* at *12.

In the alternative, the court addressed Doolen's argument that the court should reverse West Point's decision because it was arbitrary and capricious. First, the court held that plaintiffs do not need to exhaust administrative remedies prior to seeking judicial review under the APA unless a statute or agency regulation clearly mandated exhaustion as a prerequisite and that none did so here. *Id.* at *12. Then, the court evaluated the merits of Doolen's challenges to the administrative proceedings and concluded that West Point's determination of separation with recoupment was not arbitrary, capricious, or contrary to law. *Id.* at *12-17.

## DISCUSSION

On appeal, Doolen first argues that West Point's separation procedures do not meet due process requirements. Next, he argues that West Point violated its own mandatory regulations by failing to (1) provide Doolen with the SJA's legal review before his case file was forwarded to the Superintendent and the Secretary of the Army to complete separation and (2) accurately apply the

21

preponderance of the evidence standard. The government argues that West Point's procedures are consistent with due process requirements. It also argues that Doolen's claims that West Point failed to follow its own regulations are barred because he failed to administratively exhaust them, but that, in any event, they are nonjusticiable claims because none of the purported violations caused Doolen substantial prejudice.

We review a district court's grant of a motion to dismiss or for summary judgment de novo. *Ashmore v. CGI Grp., Inc.*, 923 F.3d 260, 271 (2d Cir. 2019).

**I.        The Intra-Military Immunity Doctrine**

Federal courts have long recognized that "[t]he military constitutes a specialized community governed by a separate discipline from that of the civilian." *Chappell v. Wallace*, 462 U.S. 296, 301 (1983) (quoting *Orloff v. Willoughby*, 345 U.S. 83, 94 (1953)). Courts grant "greater deference" in the context of national defense and military affairs than perhaps any other area. *Id.* (quoting *Rostker v. Goldberg*, 453 U.S. 57, 65 (1981)). "[T]he doctrine of intra-military immunity . . . generally protects the government from suit for injuries arising from activities incident to military service." *Overton v. N.Y. State Div. of Mil. & Naval Affs.*, 373

22

F.3d 83, 89 (2d Cir. 2004) (citation, brackets, and internal quotation marks omitted). Accordingly, "[f]ederal courts will not normally review purely discretionary decisions by military officials which are within their valid jurisdiction." *Jones v. N.Y. State Div. of Mil. & Naval Affs.*, 166 F.3d 45, 52 (2d Cir. 1999) (brackets and citation omitted).

Nevertheless, "non-justiciability of discretionary military decisions is not absolute." *Id.* Two major exceptions to the intra-military immunity doctrine exist. First, we review facial challenges to the constitutionality of military regulations. *See Dibble v. Fenmore*, 339 F.3d 120, 126-27 (2d Cir. 2003). Second, we review claims that "the military has failed to follow its own mandatory regulations in a manner substantially prejudicing a service member." *Jones*, 166 F.3d at 52. Both exceptions are relevant to Doolen's claims, and we may review only the portions of Doolen's claims that fit within them.

## II.    The Facial Challenge: Whether West Point's Cadet Separation Procedures Meet Due Process Requirements

Doolen argues that, in addition to the CI hearing adjudicating whether a cadet is deficient in conduct, due process requires the Army to provide a cadet

23

with a separate hearing prior to ordering his separation and recoupment. We disagree with Doolen and hold that West Point's cadet removal procedures satisfy due process.

To successfully state a due process violation, a plaintiff must point to a deprivation of "life, liberty, or property." U.S. Const. amend. V. The Supreme Court's seminal case on due process, *Mathews v. Eldridge*, instructs courts to balance three factors when considering whether a particular procedure is constitutionally adequate:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. 319, 335 (1976).

As to the first factor, Doolen has a significant private interest in the recoupment he must pay to the government as a result of his separation.[4]

---

[4] The government concedes that the recoupment Doolen was ordered to repay is a cognizable property interest. Accordingly, we need not address the question of whether an individual has a constitutional property interest in future military

As to the second factor, the value of requiring an additional hearing after a finding of deficiency but prior to an order of separation is minimal. And as to the third factor, the military has a very strong interest in "govern[ing] its own affairs" and determining who would best meet uniquely important standards of conduct and discipline. *Hagopian v. Knowlton*, 470 F.2d 201, 208 (2d Cir. 1972) (citation omitted). As explained below, West Point's current cadet separation procedures successfully balance these three concerns.

The Army provides a robust combination of pre- and post-deprivation procedures for cadets facing separation from West Point. By the time the Army begins considering separation, the cadet has already appeared in person before an IO, presented live testimony, and cross-examined witnesses at the CI. *See* USCC Reg. 351-1 ¶¶ 104, Sequence of Actions Timetbl., 113(d), 114(m). Because the primary purpose of the CI is to assess the veracity of the allegations and possible deficiency in conduct, a cadet may not present witnesses on the final question of separation during a CI. But this bar also applies to the CI generally;

---

service. *Cf. MacFarlane v. Grasso*, 696 F.2d 217, 219, 222 (2d Cir. 1982) (finding no "legitimate claim of entitlement" to a position as a "stock control officer" in the Connecticut Army National Guard).

25

that is, the IO also may not hear or call witnesses to testify on separation either, as that question is left for the Commandant to resolve. *See id.* fig. 2-6 ¶ 4. Moreover, a cadet may present general character witnesses who can opine on his behavior and fitness to serve, as Doolen did here. This testimony remains part of the record before the Superintendent, who may recommend separation, and the Deputy Assistant Secretary, who ultimately has the authority to order separation. A cadet may also make additional written submissions prior to the separation decision. Adding another hearing to this framework would contribute little value, as the initial CI already provides the benefits of a live hearing.

In addition to pre-deprivation procedures, a cadet also has post-deprivation remedies. A cadet may appeal a separation decision to the ABCMR, which can order a hearing and has the authority to hear new evidence or request new opinions. *See* 32 C.F.R. § 581.3(c)(2)(iii). Doolen speculates that the ABCMR cannot be objective because its members are appointed by the Secretary of the Army. However, many agency adjudicative authorities are appointed by the agency itself, and without some specific showing of conflict of interest or reason for disqualification, we assume they are unbiased. *See Schweiker v. McClure*, 456

26

U.S. 188, 195-96 (1982). Doolen also points out that, if the ABCMR holds a hearing, the ABCMR may only recommend a disposition to the Secretary of the Army, who ordered the initial separation and may ignore the recommendation. But Doolen offers nothing more than speculation that the Secretary would not seriously contemplate a recommendation to overturn a separation order. In any event, ABCMR decisions, along with any subsequent Secretary determinations, are appealable to federal courts, 10 U.S.C. § 1558(f), which further eases concerns about purported bias. Where, as here, a given procedure includes "some form of pre-deprivation hearing" and post-deprivation remedies with "the opportunity to obtain full judicial review," the "combination" of the two provide due process. *Rivera-Powell v. N.Y.C. Bd. of Elections*, 470 F.3d 458, 466-67 (2d Cir. 2006).

Doolen's principal argument—that the Army must provide a hearing not only during the CI but also after the CI if a West Point official recommends a cadet's separation from the Academy—is premised on three cases we decided several decades ago, all of which address the procedural safeguards protecting cadets at that time: *Andrews v. Knowlton*, 509 F.2d 898 (2d Cir. 1975); *Hagopian v. Knowlton*, 470 F.2d 201 (2d Cir. 1972); and *Wasson v. Trowbridge*, 382 F.2d 807 (2d

27

Cir. 1967). *Andrews* and *Wasson* explain that, prior to separation, a cadet should "be apprised of the specific charges" and "given an adequate opportunity to present his defense both from the point of view of time and the use of witnesses and other evidence." *Andrews*, 509 F.2d at 904 (quoting *Wasson*, 382 F.2d at 812). In *Hagopian*, we further held that cadets are entitled to a "full hearing" prior to separation, even if the grounds for separation are the automatic accumulation of excessive demerits. 470 F.2d at 211. "[W]e conclude[d] that at a hearing at which Academy officials will determine whether or not a cadet will be expelled[,] the cadet must be allowed to appear and present evidence, including witnesses, on his behalf." *Id.*

Doolen's argument misconstrues our precedent. Although *Hagopian* emphasized the importance of hearing evidence and resolving credibility issues in person rather than through written submissions, it did so in the context of the initial adjudication of guilt, not the imposition of a sanction after guilt has already been determined. *See id.* at 205-06 (explaining that, at that time, cadets with excessive accumulated demerits received no hearing, were automatically considered deficient in conduct, and could only submit written paperwork to the

28

Academic Board, which gave its recommendation for retention or separation to the Secretary of the Army). At the time, West Point provided little to no opportunity for cadets to defend themselves in person during disciplinary proceedings. As already explained, today's cadets (including Doolen) have the opportunity to appear for a live hearing during their CI, where they may present and cross-examine witnesses and make arguments on their behalf. This satisfies "the rudiments of a fair hearing" that we outlined in *Hagopian*, which also specified that cadets need not be given the same "opportunity" multiple times throughout the disciplinary decision-making process. *Id.* at 210 (quoting *Wasson*, 382 F.2d at 812). *Hagopian*, *Andrews*, and *Wasson* do not affirmatively require the Army to provide a separate, live hearing dedicated entirely to the question of separation.

We also disagree with Doolen's argument that we should now require an additional separation hearing. "[O]rderly government requires us to tread lightly on the military domain, with scrupulous regard for the power and authority of the military establishment to govern its own affairs within the broad confines of constitutional due process." *Id.* at 208 (citation omitted). Even particularly

"severe" penalties may be appropriate in the military context. *Andrews*, 509 F.2d at 908. Indeed, in *Andrews*, we explained that, where a cadet receives a hearing, is informed of the relevant allegations, and is able to present a defense through the use of witnesses and other evidence, the military has operated "within [the] bounds of procedural due process" and the procedure is "immune from constitutional infirmity." *Id.* at 905. All of those opportunities are available to cadets in the current separation procedure.

Despite Doolen's best efforts to distinguish a deficiency finding from a separation order, they are inextricably linked. Without being found deficient through a CI—a procedure that complies with the requirements of *Hagopian*, *Andrews*, and *Wasson*—a cadet cannot be subject to separation. After a deficiency finding, a cadet may still make written submissions to mitigate the punishment. Even after a potential separation decision occurs, a cadet may appeal to the ABCMR and ultimately to a federal court. Indeed, the very procedure Doolen challenges prevented his separation and readmitted him to the Academy after his first alcohol violation in 2013. We agree with the district court that West

30

Point's robust pre- and post-deprivation procedures guiding a separation decision satisfy due process. Therefore, Doolen's facial challenge fails.

### III. Substantial Prejudice

Doolen further argues that West Point violated its own mandatory procedural regulations during his separation proceedings. However, to circumvent the general "non-justiciability of discretionary military decisions," Doolen must show that the regulatory deviations "substantially prejudic[ed]" him. *Dibble*, 339 F.3d at 128. He has not done so.

It is undisputed that Doolen was never served the SJA's legal review before it was forwarded to the Superintendent for action, even though West Point's regulations provide him with an opportunity to comment on the legal review. *See* USCC Reg. 351-1 ¶ 114(m); *see also* Appellees' Br. at 47. Doolen claims that the SJA's legal review contains prejudicial factual errors that he would have contested and corrected had he been properly served. Specifically, the SJA included in its legal review (1) the 2015 allegations from Doolen's ex-girlfriend that Doolen had been physically abusive towards her and that he had used illegal drugs and (2) the fact that Doolen was arrested in 2013 for driving under

31

the influence ("DUI") in Missouri. A document attached to the SJA memorandum indicates that military personnel had found "insufficient evidence to determine whether probable cause exists to believe . . . Doolen committed the offense of wrongful use of a controlled substance." App'x at 88. Also attached is the incident report documenting Doolen's 2013 DUI arrest in Missouri.

We acknowledge that Doolen should have had an opportunity to comment on the SJA's legal review. He was entitled to that process, and the government offers no explanation for why it did not happen. However, the legal standard requires Doolen to show more than the mere existence of a procedural violation; he must also show the violation caused substantial prejudice.

Having reviewed the reasons leading to Doolen's separation, we conclude that Doolen's inability to comment on the SJA's legal review did not substantially prejudice him. At the outset, with regard to the drug and assault issues, the SJA did not report these incidents as fact; instead, the legal review characterized them as allegations and clarified that USCC trial counsel had found probable cause only as to the assault allegations. Moreover, Doolen was indeed arrested in Missouri for a DUI charge. Although Doolen claims that the charge was incurred

32

while Doolen was suspended from the Academy and that authorities later dismissed the charge, these additional facts do not render the SJA's statements about the incident inaccurate.

The Superintendent's stated reasons for recommending separation fortify our conclusion that substantial prejudice did not occur. The Superintendent clarified that his decision to recommend separation took into consideration Doolen's "failure to disclose the arrest to his chain of command," not the arrest itself. App'x at 75. Therefore, the subsequent dismissal of the DUI charge is of no matter; it was Doolen's lack of transparency upon returning to the Academy that played a role in the Superintendent's decision. That Doolen was suspended from the Academy at the time he was arrested for the DUI charge also bears little relevance; clearly, it was important to West Point leadership that Doolen disclose any updates to his criminal history upon returning. Finally, the Superintendent's recommendation did not refer to the 2015 allegations at all, so Doolen fails to show how an opportunity to cure any purported errors as to those statements would have changed the outcome. Doolen has not demonstrated that correcting (or perhaps, more accurately, contextualizing) the SJA's statements would have

altered the Superintendent's conclusion, based on the findings in the underlying disciplinary hearing itself, that "the retention of [Doolen] is not considered to be in the best interests of the Corps of Cadets, the Military Academy or the United States Armed Forces." USCC Reg. 351-2 ¶ 312(b).

Doolen also argues that Forlenza, the IO presiding over Doolen's final CI, violated the West Point regulation dictating that IO findings "must be supported by a preponderance of the evidence." *Id.* 351-1 ¶ 116. This argument essentially seeks to circumvent the intra-military immunity doctrine by framing an internal military judgment as a procedural irregularity. As the district court explained, considering this question would require "the wholesale reconsideration of a discretionary military personnel decision." *Doolen*, 2018 WL 4300529, at *10. This issue is unlike true procedural deviations in that it "involves a fact-specific inquiry into an area affecting military order and discipline," which is exactly the type of review that the intra-military immunity doctrine bars. *Dibble*, 339 F.3d at 127 (citation omitted). It reaches the heart of the question that Forlenza was authorized to answer—whether Doolen's conduct was "a substantial departure from the standards of conduct expected of members of the Corps of Cadets."

34

USCC Reg. 351-2 ¶ 504(b). Forlenza acknowledged the preponderance of the evidence standard, weighed the evidence accordingly, and reached a discretionary decision that he was authorized to make. Multiple layers of military review affirmed that decision. For our purposes, this is sufficient. We will not review "discretionary decisions by military officials which are within their valid jurisdiction." *Smith v. Resor*, 406 F.2d 141, 145 (2d Cir. 1969).

Doolen refers to other details from the disciplinary hearing and appears to suggest that they are also procedural errors or deviations. For example, he highlights Forlenza's statements that he would assess Doolen's present, not past, conduct, based on the witnesses and evidence presented at the CI. Despite Forlenza's statement that he would not use "anything in the past to determine the outcome," App'x at 345, Doolen was also aware that the triggering event for the CI was receiving two alcohol boards, which made at least some of his past conduct inherently relevant. Moreover, Forlenza further explained that he would base a deficiency or proficiency finding based on witnesses presented at the CI hearing. Forlenza's subsequent written decision relied on evidence pertaining to the two alcohol boards and the character witnesses presented at the hearing, so it

35

is not clear how any of his statements amounted to error. Doolen also asserts that there was some confusion as to whether the June 2014 hearing was an alcohol board, but Mauldin, who presided over that hearing, testified that the June 2014 proceeding "[a]bsolutely" was an alcohol board. App'x at 387. Moreover, Doolen fails to connect these—or any other passing references to—purported procedural flaws to any mandatory regulation, much less demonstrate that they caused substantial prejudice to the ultimate conclusion that Doolen's conduct indicated that his retention was not "in the best interests of the Corps of Cadets, the Military Academy or the United States Armed Forces." USCC Reg. 351-2 ¶ 312(b). Without such a showing, Doolen's regulatory claims fall outside the scope of the two exceptions to the intra-military immunity doctrine. Therefore, we may not reach them.

We note that the government also argued that Doolen failed to exhaust administrative remedies on his claims that West Point failed to follow its own mandatory regulations. We decline to consider this question as the exhaustion issue does not affect our subject-matter jurisdiction generally, and, in any event, Doolen's claims fail for lack of substantial prejudice.

36

# CONCLUSION

We conclude that West Point's cadet removal procedures facially satisfy due process requirements. We also conclude that the intra-military immunity doctrine renders nonjusticiable Doolen's claims that West Point did not follow its own regulations because (1) Doolen was not substantially prejudiced by any purported regulatory deviation and (2) we may not circumvent the doctrine to engage in a fact-specific inquiry as to whether military personnel properly applied the military's own evidentiary standard.

Accordingly, the judgment of the district court is **AFFIRMED**.

**App'x at 979, USCC Reg. 351-1 ¶ 104.**

| Sequence of Actions Timetable | | |
|---|---|---|
| Action/Responsibility | Working Days | Cumulative Working Days |
| Deficiency identified (date of RXO's letter); Cadet, TAC CoC, and R&D Officer notified (RXO). | 0 | 0 |
| Cadet notified; regiment package recommendation received (RXO). | 3 | 3 |
| **BTO reviews regiment package- Conduct Review (BTO).** | 1 | 4 |
| Cadet notified of referral to CI (R&D). | 2 | 6 |
| CI convenes (IO). | 5 | 11 |
| IO delivers completed CI packet to R&D (IO). | 5 | 16 |
| R&D reviews and forwards case to SJA for initial review. **R&D also forwards summary of proceedings to TAC and RTO for preparation of disposition recommendations (R&D).** | 3 | 19 |
| SJA reviews and returns case to R&D Officer (SJA). | 3 | 22 |
| **R&D forwards CI packet with TAC and RTO recommendations to BTO for disposition recommendation (BTO).** | 2 | 24 |
| **R&D forwards CI packet to COM for review and recommendation to Superintendent on cadet's disposition (COM).** | 5 | 29 |
| R&D forwards Commandant's recommendation to the Superintendent through SJA (R&D). | 1 | 30 |
| Legal review completed; respondent served (SJA). | 3 | 33 |
| Respondent submits response within 72 hours. | 3 | 36 |
| SJA prepares case for Superintendent's action (SJA). | 1 | 37 |
| Superintendent reviews case, takes action, and if appropriate, case is forwarded to HQDA. | 5 | 42 |